UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

───────────────────────────────────
                                    )
UNITED STATES OF AMERICA            )
                                    )
            v.                      )  CRIMINAL NO. 08-10215-PBS
                                    )
CHARLES DOUTRE, a/k/a "O" and       )
KEVIN CARVAHLO, a/k/a "Hot Sauce,"  )
                                    )
            Defendants.             )
───────────────────────────────────)

## MEMORANDUM AND ORDER

May 5, 2009

Saris, U.S.D.J.

      Defendants are charged with trafficking in crack cocaine.

Defendant Charles Doutre moves to suppress the crack found in a

car and on his person on February 1, 2008.  Defendant Kevin

Carvahlo moves to suppress the crack found on his person during a

strip search.  At an evidentiary hearing, the government

introduced the testimony of Detective Lenny Pini, Detective

Sergeant Scott Brown, and Detective Matthew Gutwill, all of whom

are employed by the Framingham Police Department.  Defendant

introduced the testimony of Framingham Police Sergeant Blaise

Tersoni.  The motions are **DENIED**.

## FINDINGS OF FACT

**A.  The Verizon Employee Incident**

      On January 31, 2008, James Connery, a Verizon employee,

walked into the Framingham Police Department to report an

incident.  Earlier that day, Connery was at an intersection in

Framingham when a blue or purple Dodge Charger, with a black racing stripe and large chrome wheels, began beeping its horn at him.  Although he tried to elude the car, it continued to follow him.  After he turned onto Route 9 West, the Dodge Charger pulled alongside him and forced him to pull over.

There were two black men in the car.  The passenger was heavy set, about six feet three inches tall and three hundred pounds, with "prison tats" on his hands.  He walked over to Connery's window and asked if he was a cop or a federal agent. After Connery said no, the man grabbed his Verizon identification, said it was fake, accused Connery of being a federal agent, and stated that "the feds are looking at me now."

The man grabbed Connery's wallet and began looking through it (presumably for police identification).  Connery repeated that he was not a police officer.  The man responded by stating, "I'm not trying to rob you, I don't need your money, I have my own." He then took out a large wad of money and showed it to Connery. The two men then drove away.

Connery described the second man as standing about five feet eight inches tall with a ponytail.  Connery identified Doutre from a photo array as the person who had accused him of being a "fed."  Connery was shown a second array and said that the only photo that looked familiar was that of Carvahlo, whom he said looked like the driver of the Dodge Charger, but he indicated that he was only about 75% sure.  (Gov't Ex. 1.)

2

**B. The Tip About "O"**

On the evening of February 1, 2008, at about 9:50 p.m., Detective Gutwill, a member of the Narcotics Unit, spoke by telephone multiple times with a confidential informant ("CI"), who told Gutwill that "O" was in town selling crack cocaine that night with a second man.  A few days earlier, the CI had told Detective Gutwill about "O", who would come from Boston every so often with someone else and sell crack for a few hours in Framingham.  The CI described "O" as a very large black male with a scar on his face and several homemade tattoos on his hands. The CI said that "O" was currently being driven around town by a smaller black male, who had a ponytail, and that they were driving a newer looking Dodge Charger that was either black or purple with bright chrome wheels.

Prior to February 1, Gutwill had been receiving information from the CI for approximately one month.  The CI had provided Gutwill with reliable information that had led to a successful investigation resulting in multiple arrests and a seizure.  The CI had also provided other information which had turned out to be correct.  The CI told Gutwill that he had purchased cocaine from "O" in the past while the man with the ponytail was present.

The CI told Gutwill that, within the last hour, he observed "O" with about 4-5 ounces of cocaine.  "O" had made statements to the CI that he would kill anyone who reported him to the police.

The CI also said that "O" had bragged about having a gun.

Based on the information that the CI provided, particularly the description of "O" and the Dodge Charger, Gutwill believed that the individuals the CI identified were the two men involved in the January 31, 2008 incident with the Verizon employee. (Gov't Ex. 4.)

### C. The Stake-Out

Detective Gutwill was riding in an unmarked car with Detective Sean Riley, another member of the Narcotics Unit. Detective Sergeant Brown and Detective Pini, also members of the unit, were in a separate unmarked car.  Brown and Pini had read the incident report involving the Verizon employee, and Gutwill had communicated the information he had obtained from the CI to the other officers.

The CI called Detective Gutwill back and said that "O" and his companion were heading to 157 Second Street, apartment number 277, in Framingham.  The CI said that the two men were in the Dodge Charger and that, when they got to the apartment, they were going to cook up the cocaine into crack and then bag it for resale.  According to the CI, the two men would be at the apartment in a few minutes and would be inside for less than an hour.  The CI stated that if one person was in the car, there would be no drugs present, but if both men were in the car, the drugs would be there as well.  (Gov't Ex. 2; Gov't Ex. 4.)

### D. The Arrest

At about 10 p.m., Brown and Pini set up surveillance in the
back of the multi-unit apartment building at 157 Second Street,
the address identified by the CI.  Gutwill and Riley set up in
front.  As they arrived, Brown and Pini saw a black and purple
Dodge Charger, bearing Massachusetts registration number 44MJ85,
with chrome wheels and a racing stripe, parked, unoccupied, in
the rear parking lot of 157 Second Street.  After about 15
minutes, Brown and Pini saw the Dodge Charger leave the parking
lot and drive onto Second Street.

Brown and Pini advised Gutwill and Riley and then followed
the Dodge Charger.  Gutwill and Riley followed after Brown and
Pini.  At the hearing, there was inconsistent testimony as to
whether the Dodge Charger ran a red light while taking a left
turn onto Blandin Avenue, but all the officers agreed that the
car made an illegal U-turn when it performed a U-turn across a
double yellow line.

Detective Pini contacted dispatch and requested that a
marked unit conduct a traffic stop on the Dodge Charger.  Before
a marked unit could respond, however, the Dodge Charger made a
left turn onto Marble Street and parallel parked in front of
Framingham Liquors.  The driver, the man with the ponytail,
subsequently identified as Carvahlo, got out of the car.  The
passenger, subsequently identified as Doutre, remained in the
car.

Detective Pini and Sergeant Brown parked and approached the

Dodge Charger while announcing that they were Framingham police.
They were dressed in plainclothes with their police badges
hanging around their necks.  Their guns were not drawn.  Pini
went to the passenger side of the Dodge Charger.

Sergeant Brown walked over to Carvahlo and asked him to
place his hands against the wall of the liquor store.  Carvahlo
complied.  Brown stood with Carvahlo on the sidewalk by the
entrance to the liquor store while Detective Pini engaged Doutre.
Detectives Riley and Gutwill arrived and took up positions at the
back of the driver and passenger sides of the car respectively.

At the passenger side window of the Dodge Charger, Pini
could see that Doutre matched the description given by the
Verizon employee.  Pini saw that Doutre had a container of food
on his lap.  Pini saw Doutre look at him and then move his left
hand from his food container to the crotch of his pants and out
of Pini's view.  For safety reasons, Pini told Doutre to put his
hands in front of him such that Pini could see them.  Doutre
initially complied but then bent his body forward, concealing his
waist area, and again brought his left hand down toward his
waist, out of Pini's view.  Pini again told Doutre to put his
hands in front of him and to sit up.  When Doutre sat up, Pini
saw that Doutre's pants were open and his penis was sticking out
of his boxers.  This led Pini to believe that Doutre was trying
to conceal drugs or weapons in his pants.

Detective Pini told Doutre to get out of the car.  When

6

Doutre got out, Pini could see, in plain view, a plastic bag on
the passenger seat containing a large white rock-like substance,
which he recognized to be at least one ounce of crack cocaine.
He arrested and handcuffed Doutre and then frisked him.  The
detectives subsequently found three plastic vials of marijuana in
the center console of the car.  At that point, Carvahlo was
handcuffed.

Gutwill read Doutre his Miranda warnings.  Doutre asked to
speak with a lawyer.  As Pini was escorting Doutre to a police
cruiser, Doutre initiated conversation, asking Pini how long they
had been watching him, and whether "that guy" was a "fed"
(apparently referring to the Verizon employee).

Doutre and Carvahlo were brought to the Framingham Police
Station for booking.  Doutre and Carvahlo were separately booked
and inventory searches of their bodies were conducted.  Among
other things, Doutre had $751 and Carvahlo had $151.

At the station, Carvahlo was provided with Miranda warnings.
He waived orally and signed a consent form.  Carvahlo was asked
about the incident with the Verizon employee.  He said that he
was in the car when Doutre got out and went up to the "fed" who
had been following them.  Carvahlo denied getting out of the car
and said that the "fed" handed Doutre his wallet.  Carvahlo
stated that the car belonged to his uncle.  He denied knowing
anything about the cocaine in the car and said he would not be
involved with cocaine because he worked with children.  (Gov't

7

Ex. 2; Gov't Ex. 4.)

### E. The Strip Search

The Framingham Police Department Policy on Booking and the Holding Facility #400-2 in effect at the time provides that "a strip or visual cavity search of an arrestee is allowed only if officers have probable cause to believe that the arrestee is concealing contraband or weapons on his body."

The officers here decided to conduct a strip search of Doutre because the CI had said that Doutre and Carvahlo had 4-5 ounces of crack but the officers had only recovered one ounce, and Doutre appeared to be attempting to hide something in his crotch area in the car.  In the public booking area, the officers told Doutre to remove his shirt.  Doutre became agitated.  When Doutre pulled his shirt up, a bag of crack fell to the floor. After the officers recovered the crack, they conducted strip and visual body cavity searches of Doutre, but they did not recover any additional contraband.  The police recovered a total of 43 bags of cocaine amounting to approximately 25 grams from Doutre's person.

After Doutre had been searched and Carvahlo had been interrogated, Detectives Gutwill and Pini began a strip search of Carvahlo, which had been approved by Detective Sergeant Brown, who supervised the search.  The search of Carvahlo was based on the fact that the CI had said that Doutre and Carvahlo had 4-5

ounces of crack cocaine but the officers had only recovered approximately two ounces, that the CI had said that the two were a team and packaging the crack together, that Doutre had been trying to hide crack in his crotch area in the car, and that they had found additional crack on Doutre at the station.

Although Carvahlo had been cooperative until then, he initially refused to take off his clothes.  Eventually, he removed his shirt, then his shoes, socks and eventually his pants.  The officers asked Carvahlo to turn around and bend over. As he bent over, a plastic bag was revealed between his buttocks.[1]  The officers told Carvahlo to squat.  A knotted sandwich bag holding ten smaller bags each containing a pea-sized piece of crack fell to the ground.  At that point, a visual body cavity search was conducted, but no more drugs were found.  The booking process was then completed.  The net weight of the crack found on Carvahlo was 2.82 grams.  (Gov't Ex. 4; Def. Ex. 3.)


### F.  The Apartment Search

Detective Pini returned to 157 Second Street.  Two people there told Pini that "O" and a man with a ponytail had been at the apartment earlier and had a large amount of crack cocaine, which they asked to package in the apartment.  The two men had

---

[1] There is inconsistent testimony about when the police saw the drugs.  I credit Detective Gutwill's testimony because it is consistent with his contemporaneously prepared report.

been there three times before.  The two people in the apartment
reported that they saw the two men with two large chunks of
cocaine, the largest amount they had seen them possess.  "O" gave
them a $40 bag of crack cocaine to smoke as well as the shavings
left over from cutting the drugs.  Pini also found drug packaging
materials in the apartment.  (Gov't Ex. 3.)

## CONCLUSIONS OF LAW

1.  Based on the detailed, first-hand information from their
reliable confidential informant, and the report of the incident
involving the Verizon employee, the police had reasonable
suspicion that Carvahlo and Doutre were engaged in drug
trafficking and had assaulted the Verizon employee.  Not only
were Carvahlo and Doutre in the unique Dodge Charger, described
by both the Verizon employee and the CI, but their physical
descriptions matched as well.  Accordingly, the Terry stop of the
driver and passenger was proper.

2.  The police lawfully ordered Doutre out of the car as
part of the Terry stop.  In light of the observation that
Doutre's hands kept moving to his crotch and that his pants were
open, and the information from the CI that "O" had a gun and
bragged he would use it as well as Doutre's belligerent attitude
to the Verizon employee, the police had the right to order Doutre
out of the car for their safety.  See United States v. Soares,
521 F.3d 117, 121 (1st Cir. 2008) (holding that passenger's
furtive movements justified removing passenger from vehicle and

frisking him); <u>United States v. Romain</u>, 393 F.3d 63, 72 (1st Cir. 2004) (holding brief detainment of defendant justified by informant's tip that defendant had a gun); <u>see also</u> <u>Maryland v. Wilson</u>, 519 U.S. 408, 415 (1997) (holding that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop).

3.   The police had reasonable suspicion to do a strip search of Doutre at the station.  <u>See</u> <u>Swain v. Spinney</u>, 117 F.3d 1, 7 (1st Cir. 1997) (holding that the reasonable suspicion standard governs strip searches of arrestees).  Because Doutre was arrested for a drug trafficking crime, the police were justified in conducting a strip search.  <u>See</u> <u>United States v. Barnes</u>, 506 F.3d 58, 62 (1st Cir. 2007) (holding a strip search justified by defendant's arrest for a drug trafficking crime).  Other facts also justify the strip search.  During the stop, Doutre had continually moved his hands to his crotch area and opened his pants.  <u>See</u> <u>Kraushaar v. Flanigan</u>, 45 F.3d 1040, 1046 (7th Cir. 1995) (holding strip search reasonable where defendant made gestures as if attempting to hide something in his pants). Additionally, the informant had seen 4-5 ounces of cocaine earlier that night, but only about one ounce of cocaine was recovered from the car.

4.   While a closer question, the police also had reasonable suspicion to do a strip search of Carvahlo because of his arrest for a drug trafficking crime.  When Carvahlo bent over, the

police saw a clear plastic bag between his buttocks.  The order to bend over constitutes a visual body cavity search, or at least the first stage of such a search.  I find that the police had reasonable particularized suspicion to justify such a search because the combined weight of the crack found on Doutre and in the car was about 54 grams (slightly less than two ounces), far less than the expected 4-5 ounces.  Moreover, Doutre had been suspicious that the "feds" were following him and the police found crack cocaine hidden on his body.  The police reasonably relied on the CI's estimate of the amount of crack as his reliability had been fully corroborated by the investigation, and the CI said that he personally observed the amount of crack in the defendants' possession.  See Barnes, 506 F.3d at 62 (requiring a "more particularized suspicion that contraband is concealed" to justify visual body cavity search).  Accordingly, the police had sufficient reasonable particularized suspicion to believe that Carvahlo had secreted the remaining crack in his bodily crevice.

**ORDER**

The motions to suppress [Docket No. 33; Docket No. 38] are **DENIED**.


                                     S/PATTI B. SARIS
                                     **United States District Judge**